# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as "Docta Canis", "Big Wood", "Colt45caliber", "The Hard Tard", "homo chomo", and "colt45caliber@gmail.com" that is within the possession, custody, or control of GOOGLE, INC. | Case No. 2:19-MJ-04758 |

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☑ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2703(a), 27003(b)(1)(A), 2703(c)(1)(A), and 2703(d) | *See attached* |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

SA Andrew James Marguette - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State:  Los Angeles, CA

_____
*Judge's signature*

HON. ROZELLA A. OLIVER, U.S. Magistrate Judge
*Printed name and title*

AUSA: JMC EXT: 6520

**AFFIDAVIT**

I, Andrew J. Marquette, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.    I have been employed as a SA with the FBI since March 2019. I am presently assigned to the Los Angeles Field Office, Long Beach Resident Agency, where I am responsible for investigating violent crimes, threats to life, and other violations of federal statutes. I received formal training to become a SA at the FBI Academy in Quantico, Virginia, which included training on interstate commerce violations, including interstate threats made online or by other electronic means.

3.    I am one of the SAs responsible for investigating matters referenced in this affidavit. Because of my participation in this investigation, which includes reviewing evidence and analyzing reports and statements made by other law enforcement personnel, I am familiar with the facts and circumstances of this investigation.

1

## II.  **PURPOSE OF AFFIDAVIT**

4.   This affidavit is made in support of an application
for a warrant for information associated with the accounts
identified as, "Docta Canis", "Big Wood", "Colt45caliber", "The
Hard Tard", "homo chomo", and "colt45caliber@gmail.com" (the
"SUBJECT ACCOUNTS") that are stored at premises owned,
maintained, controlled, or operated by Google, Inc. (the
"PROVIDER"), an electronic communication and remote computing
services provider, headquartered at 1600 Amphitheatre Parkway,
Mountain View, California 94043.[1] The information to be searched
is described in Attachment A. This affidavit is made in support
of an application for search warrant under 18 U.S.C. §§ 2703(a),
27003(b)(1)(A), 2703(c)(1)(A), and 2703(d)[2] to require the

---

[1] Because this Court has jurisdiction over the offense(s) being
investigated, it may issue the warrant to compel the PROVIDER
pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18
U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider…pursuant to a warrant issued using the
procedures described in the Federal Rules of Criminal
Procedure…by a court of competent jurisdiction") and 2711 ("the
term 'court of competent jurisdiction' includes – (A)any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that – (i) has jurisdiction over the offense being investigated;
(ii) is in or for a district in which the provider of a wire or
electronic communication service is located or in which the wire
or electronic communications, records, or other information are
stored; or (iii) is acting on a request for foreign assistance
pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d). To obtain the basic subscriber
information, which do not contain content, the government needs
only a subpoena. See 18 U.S.C. § 2703(c)(1), (c)(2). To obtain
additional records and other information--but not content--
pertaining to subscribers of an electronic communications
service or remote computing service, the government must comply

PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A and B are incorporated herein by reference.

5.    As described more fully below, I respectfully submit there is probable cause to believe that the requested information associated with the SUBJECT ACCOUNTS includes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Section 875(c) (communication containing threat to injure).

6.    The statements in this affidavit are based upon my personal observations, my training and experience, my investigation of this case, and, where noted, information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not

---

with the dictates of section 2703(c) (1) (B) , which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d). The requested warrant calls for both records containing content (see Attachment B paragraph 11.10.a) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph Il.lO.b).

purport to set forth all of my knowledge of or investigation
into this matter. Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  <u>SUMMARY OF INVESTIGATION</u>

7.    The PROVIDER allows Internet users to store digital
files online, in the Internet "cloud" which can be viewed by
other users. On August 22, 2019, FBI National Threat Operations
Center ("NTOC") received a report of an unknown subject making
threats against people, specifically children, via videos posted
on YouTube, a platform owned and operated by the PROVIDER. My
personal observations of the content in the SUBJECT ACCOUNTS
reveal they contain evidence of the offense, as well as showing
that the user of the SUBJECT ACCOUNTS resides in the Central
District of California. As set forth below in more detail, I
believe there is probable cause to search the SUBJECT ACCOUNTS
for evidence related to threat to injury offenses.

### IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

8.    On August 22, 2019, the FBI NTOC received a report of
an unknown subject making threats against people, specifically
children, in YouTube videos. The videos were uploaded to the
user name "Docta Canis."

9.    On or about August 26, 2019, I reviewed the videos
mentioned in the report, which were publically available on
YouTube. In one video entitled "I can't take getting stalked
anymore," the man in the video described a scheme where

individuals he describes as his "stalkers" are flagging his
Facebook account and shutting down his online profiles. He
mentions a "Josh Russell" by name. The man states that these
people harassing his online persona are giving him a reason to
kill children.

10.   In a second video entitled "Stop Josh Russell or I
will kill," the same man rants about the "stalkers'" negative
effects on his online profiles and ends the video by saying "I'm
going to kill children."

11.   The descriptions associated with each of the videos
provided links to three other YouTube channels that "Docta
Canis" claimed were his own: "Big Wood," "Colt45Caliber," and
"The Hard Tard." The description also listed his personal email
as colt45caliber@gmail.com.

12.   After I had watched the videos, I then reviewed
comments that were posted below the videos, including a
discussion between "Docta Canis" and a commenter. The commenter
asked why "Docta Canis" was upset and wanted to act violently.
In reply "Docta Canis" posted a link to a video. The video in
the link was entitled "Liar, Liar, Pants on FIre!!" and posted
by YouTube account "homo chomo." The video depicts an
unidentified man who talks about a person named "Colton Wood"
and the interactions they have had over Wood's apparent service
animal. While the man discusses his interactions with Colton
Wood, text is overlaid overtop of the video attempting to refute
the man's arguments about his service animal and make claims
that the unidentified man is a child molester.

13.   A records check of "Docta Canis" on federal law enforcement databases revealed the existence of over seven other reports dating back to August 2017 where similar threats to injury and life against people and children had been made by "Docta Canis" via his YouTube videos. Multiple reports identified the man in the videos as Colton David Wood. One report, which summarizes contact between Torrance Police and Colton Wood, contains photos, which are identified as photos of Colton Wood. These photos match the individual shown in the two YouTube videos by "Docta Canis" described above, as well as videos referenced in the previous reports made on "Docta Canis."

14.   One of the reports on the federal law enforcement database contained criminal records for Colton Wood in California. From these records, I learned that Colton Wood has multiple previous convictions in California, including Criminal Threats, Threating Letter with Intent to Extort, and Cruelty to Animals, among other convictions. The report also notes that Colton Wood has a lifetime mental health firearms prohibition in the state of California.

15.   Another video was saved to these reports entitled "Do not attach or even visit my Facebook again or the protocol will be executed +." In the video a person, whose physical appearance and voice matched the physical appearance and voice of the individual in the "Docta Canis" videos referenced above, was upset that his Facebook account was subject to a 30-day ban because of his "stalkers" flagging his Facebook posts. In the video, he states: "You're trying to get kids killed, you're

6

trying to get me to fucking commit an atrocity. And it's going to work motherfuckers."

16.   On September 4, 2019, while searching for additional videos on YouTube, I discovered that YouTube removed YouTube channels "Docta Canis", "The Hard Tard", and "Big Wood" for multiple violations of YouTube's policy on bullying, harassing, and threatening content. Videos on these channels were no longer available. The channel "colt45caliber" remained active and videos posted there were still available to view.

17.   On September 23, 2019, I viewed additional videos that had recently been posted to the YouTube channel "colt45caliber". In one video entitled "West Covina Business," the person narrating the video walks around outside the West Covina Police Station lamenting the fact that his cellular telephone's screen is cracked and he can't get to court. The voice of the person narrating the video matches the voice in the "Docta Canis" videos referenced above. In the video's comment section, one commenter notes "Sounds like you need a new phone," To which "colt45caliber" responds: "Yes a phone is my most vital resource and is the most likely reason I'll lash out and start killing people."

18.   After performing a search for "Colton Wood" I discovered an additional video posted to the YouTube channel "online yard sale" dated September 16, 2019. The video entitled "terroristic threatening of colton wood" featured a person whose physical appearance and voice matched the physical appearance and voice of the individual in the "Docta Canis" and

"colt45caliber" videos referenced above. The video's narrator notes that his Instagram account was attacked by people who falsely flagged his account for inappropriate content. In response the narrator says, "I just want to remind people that if you take down the social media accounts, any of them connected to this shit at this point, I am going to kill innocent children in your name." He reiterates that he has been a victim of people who flag his account with what he describes as child pornography accusations. He mentions he has evidence that these people were falsely flagging his account and then states "And remember I am going to kill them with torture too. You are going to have to look into the eyes of the families of people who have watched their children burned alive if you continue to try to hide pedophile attacks. Give me a reason you mother fuckers." He then screams "Flag! Go ahead!"

19.  On September 30, 2019, I reviewed additional videos posted to the YouTube channel "colt45caliber". One video was entitled "Aaron Woody got me 5150 for 3 whole days by impersonating me and re uploading old videos." While being detained by a Sheriff's Deputy, the video's narrator provides his name as Colton David Wood with a birth date of July 20, 1985. The voice of Colton David Wood matches the voice in the "Docta Canis" and "colt45caliber" videos referenced above.

V.   **BACKGROUND REGARDING DIGITAL CONTENT OFFENSES, COMPUTERS, THE WORLDWIDE INTERNET COMPUTER COMMUNICATION NETWORK,**

## DEFINITION OF TERMS, AND THE USE OF GOOGLE AS MEANS FOR SHARING DIGITAL CONTENT

### A.    COMPUTER TECHNOLOGY AND DIGITAL CONTENT

20.    Computers and Digital Content. Computers and computer technology have revolutionized the way in which digital content is produced, distributed, and utilized. The use of digital technology has enabled users to electronically receive, distribute, and possess digital files with other Internet users worldwide.

21.    File Storage. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital files are extremely mobile and are easily reproduced and transported. For example, with the click of a button, digital files can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if digital files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing digital files would require a

computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

22.  Internet. The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

23.  Internet Service Providers. Individuals and businesses obtain access to the Internet through ISPs. ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application

information, and other information both in computer data and
written record format.

24.   IP Addresses. An Internet Protocol address ("IP
Address") is a unique numeric address used to connect to the
Internet. An IPv4 IP Address is a series of four numbers, each
in the range 0-255, separated by periods (e.g., 121.56.97.178).
In simple terms, one computer in a home may connect directly to
the Internet with an IP Address assigned by an ISP. What is now
more typical is that one home may connect to the Internet using
multiple digital devices simultaneously, including laptops,
tablets, smart phones, smart televisions, and gaming systems, by
way of example. Because the home subscriber typically only has
one Internet connection and is only assigned one IP Address at a
time by their ISP, multiple devices in a home are connected to
the Internet via a router or hub. Internet activity from every
device attached to the router or hub is utilizing the same
external IP Address assigned by the ISP. The router or hub
"routes" Internet traffic so that it reaches the proper device.
Most ISPs control a range of IP Addresses. The IP Address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning
that the IP Address is only assigned for the duration of that
online session. Most ISPs maintain records of which subscriber
was assigned which IP Address during an online session.

25.   IP Address – IPv6. Due to the limited number of
available IPv4 IP addresses, a new protocol was established
using the hexadecimal system to increase the number of unique IP

addresses. An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F. An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

### B.   GOOGLE

26.   In my training and experience, I have learned that providers of e-mail and/or social media services, such as Google, offer a variety of online services to the public. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.

27.   A subscriber of Google can also store with Google files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or photos or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by Google. Google allows up to 15 gigabyte of free storage online.

28.   Google owns a variety of subsidiary companies that it operates in conjunction with its main corporate offerings. One of these subsidiary companies is YouTube, an online video sharing website designed to provide a platform for users to upload and post videos to their channels for other users on the site to watch.

C.   CLOUD-BASED STORAGE

29.   Based my training and experience, I have learned that there are numerous cloud-based storage services available for consumers offering many different capabilities. In general, cloud-based storage services can be defined as an online storage mediums on the Internet accessed from a computer or electronic storage device. Providers, such as Dropbox, Inc. and Oath Holdings Inc., make it possible for the user to have access to saved files, data, programs, etcetera (referred to as "contents") without the requirement of storing said contents on their own computers or other electronic storage devices; to include physical hard drives, USB drives, CDS, DVDS, etc. The PROVIDER provides an "offsite" storage medium for contents that can be viewed at any time from any device capable of accessing the Internet.

30.   Users can store their contents on a cloud-based storage and avoid having the contents accessed and, in some cases, appear on their computers. Anyone conducting a search of an individual's computer would not be able to see the contents if the user opted to store the contents in the "cloud."

31.   In my training and experience, the subscriber information collected by the PROVIDER during the account registration process - such as name, address, telephone numbers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number) - may constitute evidence of crimes under investigation because the information can identify the user(s) of the SUBJECT ACCOUNTS.

32.   In my training and experience, providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because electronic devices that connect to the Internet use an IP address, IP address information can help to potentially identify locations where computers and devices were used to access the SUBJECT ACCOUNTS.

33.   In my training and experience, account users will sometimes communicate directly with a service provider about issues relating to the account, such as technical problems,

14

billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNTS.

34.  I request that the PROVIDER provide the entire contents for the SUBJECT ACCOUNTS since inception until the time the requested warrant is served on them, and that the items to be seized set forth in detail in Attachment B permit law enforcement to seize such items without limit as to time in order to assist in identifying the individual(s) participating in the communicating of threats to life. I further request this because the SUBJECT ACCOUNTS may have historical information about the identities of the user(s) of one or other accounts involved in this crime.

35.  The requested search warrant specifically requests any and all logs of user activity, including web requests or HTTP request, web server logs, web access logs, login tracker logs, account management logs, web proxy logs, any search history or web history, and any other information concerning web sites navigated to or analytics related to the SUBJECT ACCOUNTS. Those records can show other actions taken in furtherance of criminal activity.

15

36.   In order to identify other accounts used or maintained
by the user of the SUBJECT ACCOUNTS, the warrant also calls for
the PROVIDER to disclose any cookies associated with the SUBJECT
ACCOUNTS. The warrant also calls for the PROVIDER to identify
any other accounts accessed by any computer or web browser using
the same cookies (but not to provide the contents of
communications in those accounts).

37.   I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time. Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the provider. They may also be used by multiple
people. Given the ease with which e-mail accounts may be created
under aliases, and the rarity with which law enforcement has
eyewitness testimony about an individual's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.

38.   Only by piecing together information contained in the
contents of an account may an investigator establish who was the
actual user of an account. Often those pieces will come from a
time period before the account was used in the criminal
activity. Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of

the account. Therefore, the complete contents of a given
account, including the e-mail addresses and messages sent to
that account, often provide important evidence regarding the
actual user's dominion and control of that account. For the
purpose of searching for content demonstrating the actual
user(s) of the SUBJECT ACCOUNTS, I am requesting a warrant
requiring the PROVIDER to turn over all information associated
with the SUBJECT ACCOUNTS without a date restriction for review
by the search team.

39.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNTS. If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

40.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of e-mail conversation s to determine their
true meaning) when discussing their crimes.  They can also
discuss aspects of the crime without specifically mentioning the
crime involved. In the electronic world, it is even possible to
use pictures, images and emoticons (images used to express a
concept or idea such as a happy face inserted into the content
of an e-mail or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon

17

and parenthesis :) to convey a smile or agreement) to discuss
matters. "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of the SUBJECT
ACCOUNTS by law enforcement personnel with information regarding
the identified criminal activity, subject to the search
procedures set forth in Attachment B, is necessary to find all
relevant evidence within the account.

41.  As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER under seal until the investigation
is completed and, if a case is brought, that case is completed
through disposition, trial, appeal, or collateral proceeding.

42.  I make that request because I believe it might be
impossible for the PROVIDER to authenticate information taken
from the SUBJECT ACCOUNTS as its business record without the
original production to examine. Even if the PROVIDER kept an
original copy at the time of production (against which it could
compare against the results of the search at the time of trial),
the government cannot compel the PROVIDER to keep a copy for the
entire pendency of the investigation and/or case. If the
original production is destroyed, it may be impossible for the
PROVIDER to examine a particular document found by the search
team and confirm that it was a business record of the PROVIDER's
taken from the SUBJECT ACCOUNTS.

43.  I also know from my training and experience that
accounts may be purged as part of the ordinary course of
business by the PROVIDER. For example, if an account is not

18

accessed within a specified time period, its contents- - may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot)access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI.   REQUEST FOR NON-DISCLOSURE

44.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNTS, of the existence of the warrant because there is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or (4) otherwise seriously jeopardizing the investigation. The current investigation set forth above is not public, and I know, based on my training and experience, if the PROVIDER or other person notifies the target(s) of the investigation that a warrant has been issued for the SUBJECT ACCOUNTS, the target(s) might take steps to seriously jeopardize the investigation.

## VII. <u>CONCLUSION</u>

45.  Based on the foregoing, I request that the Court issue the requested warrant.

_____
Andrew James Marquette
Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before
me this _____ day of _____,
2019.


_____
HONORABLE _____
UNITED STATES MAGISTRATE JUDGE

20

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the accounts identified as "Docta Canis", "Big Wood", "Colt45caliber", "The Hard Tard", "homo chomo", and "colt45caliber@gmail.com" that are within the possession, custody, or control of Google, Inc., an electronic communication and remote computing services provider, headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, regardless of where such information is stored, held, or maintained.

i

**Instrumentality Protocol**

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I. **SEARCH PROCEDURE**

1.    The warrant will be presented to personnel of Google Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant. The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).

5.    If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the

ii

items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed—and preserved by the search team for authenticity and chain of custody purposes—until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

iii

## II. <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.   To the extent that the information described in
Attachment A is within the possession, custody, or control of
the PROVIDER, including any information that has been deleted
but is still available to the PROVIDER, or has been preserved
pursuant to a request made under 18 U.S.C. § 2703(f), the
PROVIDER is required to disclose the following information to
the government for each SUBJECT ACCOUNTS listed in Attachment A:

a.   All contents of all wire and electronic
communications associated with the SUBJECT ACCOUNTS including:

i.   All emails, communications, or messages of
any kind associated with the SUBJECT ACCOUNTS, including stored
or preserved copies of messages sent to and from the account,
deleted messages, and messages maintained in trash or any other
folders or tags or labels, as well as all header information
associated with each e-mail or message, and any related
documents or attachments.

ii.   All records or other information stored by
subscriber(s) of the SUBJECT ACCOUNTS, including address books,
contact and buddy lists, calendar data, pictures, videos, notes,
texts, links, user profiles, account settings, access logs, and
files.

iii. All folders and files associated with the
SUBJECT ACCOUNTS, including stored or preserved copies of files
sent to and from the account, the source and destination
addresses associated with file, the date and time at which each
file was sent, and any user-created organizational structure

iv

within the SUBJECT ACCOUNTS.

iv.   All transactional information of all activity of the Google, Inc. accounts described above, including log files, messaging logs, records of session times and durations, dates and times of connecting, and methods of connecting, and emails "invites" sent or received via Google, Inc., and any contact lists.

v.   All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of

v

services used, and including the dates on which such changes
occurred, for the following accounts:

>> (I)  the SUBJECT ACCOUNTS.

>> (II) any other account associated with the
SUBJECT ACCOUNTS, including by means of sharing a common
secondary, recovery, or alternate email address listed in
subscriber records for the SUBJECT ACCOUNTS or by means of
sharing a common phone number or SMS number listed in subscriber
records for the SUBJECT ACCOUNTS.

>> (III)    any other account accessed by a
device with an identifier responsive to the device identifiers
called for in paragraph 10.b.iii.

>> ii.  All user connection logs and transactional
information of all activity relating to the SUBJECT ACCOUNTS
described above in Section II.10.a., including all log files,
dates, times, durations, data transfer volumes, methods of
connection, IP addresses, ports, routing information, dial-ups,
and locations.

>> iii. Any information identifying the device or
devices used to access the SUBJECT ACCOUNTS, including any
Android ID, Advertising ID, unique application number, hardware
model, operating system version, unique device identifier,
Global Unique Identifier ("GUID"), serial number, mobile network
information, phone number, device serial number, MAC address,
Electronic Serial Number ("ESN"), Mobile Electronic Identity
Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile
Identification Number ("MIN"), Subscriber Identity Module

("SIM"), Mobile Subscriber Integrated Services Digital Network
Number ("MSISDN"), International Mobile Subscriber Identifier
("IMSI"), International Mobile Equipment Identity ("IMEI"), or
Apple advertiser ID or ID for advertisers ("IDFA"), and any
other information regarding the types of devices used to access
the SUBJECT ACCOUNTS or other device-specific information;

      iv.  Any information showing the location of the
user of the SUBJECT ACCOUNTS, including while sending or
receiving a message using the SUBJECT ACCOUNTS or accessing or
logged into the SUBJECT ACCOUNTS.

**III.  INFORMATION TO BE SEIZED BY THE GOVERNMENT**

    11.  For the SUBJECT ACCOUNTS listed in Attachment A, the
search team may seize:

      a.  All information described above in Section
II.10.a. that constitutes evidence, contraband, fruits, or
instrumentalities of violations of 18 U.S.C. §§ 875(c)
(communication containing threat to injure), namely:

      i.  Information relating to who created,
accessed, or used the SUBJECT ACCOUNTS, including records about
their identities and whereabouts.

      ii.  Files and information containing threats to
injure as defined in 18 U.S.C. § 875(c).

      iii. Any and all files or records which contain
threats to injury.

      iv.  Any files or records that pertain to
accounts with any Internet Service Provider.

      v.  Any passwords, encryption keys, and other

vii

access devices that may be necessary to access folders and files in the SUBJECT ACCOUNTS;

       b.   All records and information described above in Section II.10.b.

## IV. <u>PROVIDER PROCEDURES</u>

    12.   Notwithstanding 18 U.S.C. § 875(c) or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

        Special Agent Andrew Marquette

        4811 Airport Plaza Drive, Suite 500

        Long Beach, California 90815

        VIA EXPRESS DELIVERY SERVICE

        Phone: (310) 961-0745

        E-mail: ajmarquette@fbi.gov

    13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

    14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the PROVIDER complies

with this warrant or such later date as may be set by the Court
upon application for an extension by the United States. Upon
expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph 12 above of its intent
to so notify.